701 F.2d 1181
 4 Employee Benefits Ca 1105
 INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE, AND
AGRICULTURAL IMPLEMENT WORKERS OF AMERICA AND ITS
LOCALS 656 AND 985, et al., Plaintiffs-Appellees,
v.
GREYHOUND LINES, INC., et al., Defendants-Appellants.
 No. 81-1377.
 United States Court of Appeals,
Sixth Circuit.
 Argued Aug. 3, 1982.
Decided March 11, 1983.
Rehearing Denied June 8, 1983.
 
 Ronald G. Acho, Livonia, Mich., for defendants-appellants.
 M. Jay Whitman, Michael B. Nicholson, Detroit, Mich., for plaintiffs-appellees.
 Before ENGEL and JONES, Circuit Judges, and NEESE,* Senior District Judge.
 NATHANIEL R. JONES, Circuit Judge.
 
 
 1
 Defendants, Greyhound Lines, Inc. appeal from a district court judgment enforcing an arbitration award which required them to implement certain benefit increases in the employees' pension and benefit fund. Greyhound seeks to have the lower court's judgment vacated upon its contention that the arbitrator is a fiduciary under the Employees' Retirement Income Security Act of 1974 (ERISA) and that, as such, he acted unlawfully because he failed to satisfy the bonding requirements under the Act. Since we conclude that ERISA was not intended to subject arbitrators to civil liability, we affirm the judgment below.I
 
 
 2
 On March 25, 1956, the International United Auto Workers[1] (UAW) and the UAW Locals,[2] the collective bargaining representatives of certain hourly employees at Greyhound's Detroit Garage and Terminal, entered into an agreement with Greyhound Lines, Inc. This agreement, "Greyhound Pension Trust Plan A," provided for retirement benefits under a plan which was to be jointly administered by a board of trustees comprised of three Greyhound trustees and three Union trustees. In the event that a board vote should result in a deadlock, Article III-5 of the agreement provided for the selection of an arbitrator to resolve the dispute.[3]
 
 
 3
 The dispute that gave rise to this law suit arose at a board meeting on April 13, 1978 when the Union trustees presented a proposal to increase the benefit level for members of the retirement plan.[4] The increases were proposed in three areas:
 
 
 4
 1. Raise the benefit level from $9.25 to $11.60.
 
 
 5
 2. Increase the pension for all retirees at the terminal who retired prior to December 16, 1976 and for the garage retirees who retired prior to May 1, 1977 by 3%.
 
 
 6
 3. Pension plan to pay an additional $25 per month to all retirees from the period of their 62nd birthday through their 65th birthday.
 
 
 7
 This proposal was based upon an actuarial evaluation submitted by the Wyatt Company which was also presented to the board. The Company trustees, however, did not agree to the proposed benefit increases and decided to take the matter under advisement. At a subsequent board meeting on July 20, 1978, the Company trustees refused to implement the Union proposal and, instead, proposed a smaller increase in benefits.[5] The Union trustees would not agree to the counter-proposal and, consequently, the trustees deadlocked.
 
 
 8
 Pursuant to Article III-5 of the trust agreement, the deadlocked issue was submitted for arbitration to George Bowles. Arbitrator Bowles conducted hearings at which the Company trustees argued that the provisions of ERISA, 29 U.S.C. Sec. 1001, et seq., supersede any contrary language in the trust agreement and that arbitration was inappropriate for the settlement of ERISA rights and obligations. Moreover, they asserted that under ERISA, the arbitrator was acting as a fiduciary and, therefore, he should be bonded as required by 29 U.S.C. Sec. 1112.[6] The arbitrator issued an opinion and award in which he determined that he had the authority to decide the dispute by virtue of the trust agreement and found in favor of the Union, thereby implementing their proposal: (1) raising the benefit level, (2) increasing the pension, and (3) increasing pension payouts additionally for retirees from their 62nd through their 65th birthday.
 
 
 9
 Greyhound and its trustees refused to implement the pension increase provisions of the arbitrator's award; rather, they filed a motion for reconsideration wherein they raised, for the first time, the assertion that a preamble to the agreement barred any increase in benefits to pre-January 1, 1976 retirees. The arbitrator recognized that the issue raised by Greyhound had not been raised previously and concluded that he was without jurisdiction to amend, clarify or otherwise interpret his award.[7] The UAW instituted this action in federal district court seeking enforcement of paragraphs two and three of the arbitrator's award. The Company cross-claimed against the UAW and added arbitrator Bowles as a cross-defendant, alleging that they had failed to comply with the provisions of ERISA by implementing the increase in pension benefits. The district court held that the arbitrator was not a fiduciary nor had he exceeded his authority in issuing the award. Moreover, the court concluded that even if he were a fiduciary, he had not breached his fiduciary duty because it was not necessary that he be bonded.
 
 
 10
 The appellant contends that this appeal turns on the conflict that exists between the policy favoring arbitration of labor disputes (Taft-Hartley Act) and that of protecting employee pension and benefit plans (ERISA). Our view of the issue, however, is whether the duties and liabilities that arise under ERISA are enforceable against an arbitrator who is acting in his official capacity and, as such, entitled to arbitral immunity. Accordingly, we shall examine the doctrine of immunity and analyze it in conjunction with the applicable ERISA provisions.
 
 II
 
 11
 The common law doctrine of judicial immunity was first recognized by the Supreme Court in 1872 when it decided Bradley v. Fisher, 80 U.S. (13 Wall.) 335, 20 L.Ed. 646 (1872). This concept was deemed necessary in order to facilitate the proper administration of justice so that a judicial officer is " 'free to act upon his own convictions, without apprehension of personal consequences to himself.' " Stump v. Sparkman, 435 U.S. 349, 355, 98 S.Ct. 1099, 1104, 55 L.Ed.2d 331 (1978), quoting Bradley v. Fisher, 80 U.S. at 347 (1872). The Court has explained the underlying rationale for the principle of judicial immunity as follows:
 
 
 12
 It is a judge's duty to decide all cases within his jurisdiction that are brought before him, including controversial cases that arouse the most intense feelings in the litigants. His errors may be corrected on appeal, but he should not have to fear that unsatisfied litigants may hound him with litigation charging malice or corruption. Imposing such a burden on judges would contribute not to principled and fearless decision-making but to intimidation.
 
 
 13
 Pierson v. Ray, 386 U.S. 547, 554, 87 S.Ct. 1213, 1217, 18 L.Ed.2d 288 (1967). Accordingly, judicial immunity applies even when a judge is accused of acting maliciously or corruptly and, such immunity is forfeited only when a judge acts in "the clear abuse of all jurisdiction over the subject-matter." Bradley v. Fisher, 80 U.S. at 351. Accord Jones v. Brown, 54 Iowa 74, 78, 6 N.W. 140, 142-43 (1880).
 
 
 14
 Originally, absolute immunity extended only to judges to assure their liberty to exercise their tasks with independence and without fear of consequences. See Bradley v. Fisher, 80 U.S. at 349-50. However, the federal courts have accorded quasi-immunity to various other public officials who are entitled to the same type of immunity from liability for those acts performed while acting in their official capacities.[8] In Butz v. Economou, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1977), the Court held absolute immunity extended to the performance of quasi-judicial functions or to those whose powers and purpose are " 'functionally comparable' to that of a judge." Id. at 513, 98 S.Ct. at 2914.
 
 
 15
 The role of an arbitrator has traditionally been construed to be quasi-judicial in nature. See, e.g., Cahn v. International Union Ladies' Garment Workers Union, 311 F.2d 113, 114-15 (3rd Cir.1962) (per curiam). Traditionally, an arbitrator is one who has no interest in the outcome of the matters under his or her consideration. I. & F. Corp. v. International Ass'n. of Heat and Frost and Asbestos Workers, Local No. 8, 493 F.Supp. 147, 149 (S.D.Ohio 1980). As such, his purpose is "functionally comparable" to a judge and, consequently, he is clothed with an immunity that is analogous to judicial immunity. DeVries v. Interstate Motor Freight System, p 11,333 L.C. at p. 20,586 (N.D.Ohio 1976), affirmed, 620 F.2d 302 (6th Cir.1980), quoting Cahn v. International Ladies' Garment Workers Union, 311 F.2d at 114-15. Accord Corey v. New York Stock Exchange, 493 F.Supp. 51, 56 (W.D.Mich.1980). Therefore, arbitrators have been deemed protected from civil suit under the doctrine of "arbitral immunity." Id. at 55. Accord Raitport v. Provident National Bank, 451 F.Supp. 522, 527 (E.D.Pa.1978).
 
 
 16
 One of the policies underlying the doctrine of "arbitral immunity" is that of protecting the integrity of the arbitration or decision-making process from reprisals by dissatisfied parties. Corey v. International Ladies' Garment Workers Union, 493 F.2d at 56. The Seventh Circuit Court of Appeals emphasized this point in Tamari v. Conrad, 552 F.2d 778 (7th Cir.1977), when it reviewed the authority of a panel of arbitrators chosen by the Chicago Board of Trade. In regard to insulating the arbitrator from reprisals, the Court reasoned:
 
 
 17
 We hold that arbitral immunity should be extended to cases where the authority of an arbitrator to resolve a dispute is challenged.... [I]ndividuals cannot be expected to volunteer to arbitrate disputes if they can be caught up in the struggle between the litigants and saddled with the burdens of defending a lawsuit.
 
 
 18
 552 F.2d at 780-81. This pronouncement had been previously made by a New York Superior Court in Babylon Milk & Cream Co. v. Horvitz, 151 N.Y.S.2d 221 (Sup.Ct.1956), affirmed, 4 A.D.2d 777, 165 N.Y.S.2d 717 (1957), where the court stated:
 
 
 19
 Arbitrators exercise judicial functions and while not eo nomine judges they are judicial officers and bound by the same rules as govern those officers. Considerations of public policy are the reasons for the rule and like other judicial officers, arbitrators must be free from the fear of reprisals by an unsuccessful litigant. They must of necessity be uninfluenced by any fear of consequences for their acts.
 
 
 20
 151 N.Y.S.2d at 224 (citations omitted) (emphasis supplied).
 
 
 21
 Another policy underlying arbitral immunity stems from the national policy favoring the settlement of labor disputes by arbitration. I. & F. Corp. v. Local No. 8, 493 F.Supp. at 150. In light of the encouragement of arbitration and the necessity for arbitrators to facilitate this policy, "it follows that the common law rule protecting arbitrators from suit ought not only be affirmed, but, if need be expanded." Hill v. ARO Corp., 263 F.Supp. 324, 326 (N.D.Ohio 1967). Moreover, the public policy considerations of protecting a judge's or a juror's impartiality, independence, and freedom from undue influences apply with equal force as to arbitrators. Hoosac Tunnel Duck & Elevator Co. v. O'Brien, 137 Mass. 424, 426 (1884). Finally, and most important, this Circuit has recently held that arbitrators are immune from civil liability in Corey v. New York Stock Exchange, 691 F.2d 1205 (6th Cir.1982). See also DeVries v. Interstate Motor Freight System, p 11,333 L.C., p. 20,586 (N.D.Ohio 1976), aff'd, 620 F.2d 302 (6th Cir.1980). The Court employed the test of "functional comparability" as enunciated by the Supreme Court in Butz, supra, and concluded that such immunity should not only be extended to arbitrators, but should also extend to the boards which sponsor arbitration. 691 F.2d at 1208-11.
 
 
 22
 By breaking the deadlock at issue here, Arbitrator Bowles had no interest in the outcome of the employees' benefit plan and, consequently, his purpose was "functionally comparable" to that of a judge. In light of these well-established principles immunizing arbitrators from civil liability, we conclude that arbitral immunity extends to insulate Arbitrator Bowles from liability for acts committed while serving in his official capacity to break the deadlock between the trustees in the instant case. Upon reaching this conclusion, the issue now becomes whether ERISA was intended to abolish this immunity by subjecting every person who performs fiduciary functions to liability pursuant to 29 U.S.C. Sec. 1004(a)(1)(D).
 
 29 U.S.C. Sec. 1002(21)(A) provides that:
 
 23
 a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such a plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.
 
 
 24
 Various courts have determined that Congress purposefully defined "fiduciary" broadly in order to effectuate the ERISA policy by providing comprehensive protection for employees' benefit plans. See, e.g. Connolly v. Pension Benefit Guaranty Corp., 581 F.2d 729, 732 (9th Cir.1978), cert. denied, 440 U.S. 935, 99 S.Ct. 1278, 59 L.Ed.2d 492 (1979); Freund v. Marshall & Isley Bank, 485 F.Supp. 629, 634 (W.D.Wis.1979); Marshall v. Kelly, 465 F.Supp. 341, 349 (W.D.Okl.1979). Upon applying this definition to the instant case, we believe that by determining which benefit level increase and which pension increase should be implemented, Arbitrator Bowles could be construed to have exercised "control respecting [the] management or disposition of [fund] assets." By merely breaking the deadlock, the arbitrator was directing that assets from the fund pass from the control of the trustees to the beneficiaries. As such, his actions would seem to come within the purview of a fiduciary, as defined by ERISA.[9] Because of our disposition of the arbitral immunity issue, however, we need not decide whether an arbitrator is a fiduciary.
 
 
 25
 Our construction of the principle of arbitral immunity leads us to conclude that ERISA was not intended to abrogate this common law immunity. In Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), the Supreme Court stated:
 
 
 26
 We do not believe that [the settled principal of judicial immunity] was abolished by Sec. 1983, which makes liable "every person" who under color of law deprives another person of his civil rights. The legislative records gives no clear indication that Congress meant to abolish wholesale all common-law immunities. Accordingly, this Court held in Tenny v. Brandhove, 341 U.S. 367 [71 S.Ct. 783, 95 L.Ed. 1019] (1951), that the immunity of legislators for acts within the legislative role was not abolished. The immunity of judges for acts within the judicial role is equally well-established, and we presume that Congress would have specifically so provided had it wished to abolish the doctrine.
 
 
 27
 386 U.S. at 554-55, 87 S.Ct. at 1217-18 (footnotes omitted). Similarly, we do not believe that ERISA was intended to abolish arbitral immunity in the absence of Congress having specifically so provided such an abrogation in the legislative record. Accord Raitport v. Provident National Bank, 451 F.Supp. 522, 526-27 (E.D.Pa.1978). Although Arbitrator Bowles performed functions that arguably come within the definition of a fiduciary, we conclude that he would be entitled to immunity from liability for damages, in any event, for those acts committed while performing in his official capacity as an arbitrator.[10] Accord Morales v. Vega, 110 LRRM 2770, 2774 (D.P.R.1979). However, the arbitrator's immunity does not deprive injured employees and/or their beneficiaries of a remedy for any wrong they may suffer as a result of the benefit increase; it simply requires them to pursue their remedies against those trustee-fiduciaries who breached their duties and against whom personal liability attaches to make good any losses resulting from such breach.[11] 29 U.S.C. Sec. 1109. Accord Raitport v. Provident National Bank, 451 F.Supp. at 527.
 
 
 28
 The conclusion that ERISA does not abolish arbitral immunity is further buttressed by the Act's requirement that "[e]very fiduciary of an employee benefit plan ... shall be bonded." 29 U.S.C. Sec. 1112(a). Both Congress and the Department of Labor have emphasized that the policy underlying the bonding requirement is that of protecting the employees and their beneficiaries from losses occasioned by fraud or dishonesty on the part of fiduciaries. See 29 U.S.C. Secs. 1001(a) and (b) and 29 C.F.R. Sec. 464.9. The Department of Labor has further explained that the bonding requirements apply only to those who "handle" the funds or other plan property. 29 C.F.R. Sec. 464.1. "Handling" of funds encompasses physical contact with the funds, the power to secure possession of cash or checks from the fund, the power to transfer to oneself or a third party title to fund property, the actual disbursement of funds by the signing or endorsing of checks, or the supervisory power to order that such disbursements be made. 29 C.F.R. Sec. 464.7(b). None of these acts, however, extend to the functions performed by Arbitrator Bowles in breaking the deadlock. Therefore, since bonding is required to assure the employees' right to damages as against those who "handle" fund assets and, since the arbitrator is immune from such liability, the purposes for having a fiduciary bonded would not be served when applied to arbitrators.
 
 
 29
 Accordingly, we conclude that Arbitrator Bowles is immune from liability for damages which may result from breaking the deadlock below and, consequently, the bonding requirements that apply to fiduciaries are inapplicable as to him.
 
 III
 
 30
 Appellants also contend that paragraph two of the Union trustees' proposal contravenes the basic governing document of the Retirement Plan and, as such, it violates 29 U.S.C. Sec. 1104(a)(1)(D).[12] The governing document, the Greyhound Lines UAW Retirement Plan Preamble, provides that:
 
 
 31
 None of the provisions of the Plan as so amended shall have any application to any employee who retired or terminated employment prior to January 1, 1976; the benefits, if any, of any such person shall be determined only in accordance with the provisions of the Plan as heretofore in effect. (Emphasis supplied.)
 
 
 32
 Since the preamble precludes pre-January 1, 1976 retirees from receiving benefits under the Plan and since the Union trustees' proposal provides for benefit increases to these same retirees, appellants contend that the arbitrator's award, which encompasses these changes, should be vacated. They further submit that the Union trustees' proposal of this increase is a breach of their fiduciary duties which requires them to administer the fund in the interests of the employees and in accordance with the Plan's governing documents.
 
 
 33
 In Cutaiar v. Marshall, 590 F.2d 523 (3rd Cir.1979), the Third Circuit examined a purported conflict between the Taft-Hartley Act and ERISA and concluded that an arbitrator can break a deadlock between trustees, but he cannot insulate the trustees from their illegal acts. 590 F.2d at 530. The court further explained that the Taft-Hartley Act contemplates "the resolution of deadlocks over two permissible administrative courses of action." Id. Thus, when the dispute encompasses a transaction that is prohibited by statute or otherwise, the arbitrator has no power to approve it.
 
 
 34
 While we recognize the potential for fraudulent proposals in regard to the administration of employee funds, we feel that objections to such proposals are waived when they are not raised at the arbitration hearing. The appellants' assertion that the Union trustees' proposal was in conflict with the governing document should have been raised before the arbitrator so that he could have taken it into consideration when breaking the deadlock. As stated in Newspaper Guild Local 35 v. Washington Post Co., 367 F.Supp. 917 (D.C.Cir.1973):
 
 
 35
 the policy of the law, both in litigation and in arbitration, is to resolve the entire matter involving one claim and defenses thereto in one proceeding, with later appellate review of the entire case. Acceptance of Defendant's argument would provide a party the option of piecemeal proceedings, and asserting a new "fall-back" position only after rejection of its initial arguments. To allow this "would undercut the entire usefulness of arbitration as an expeditious and generally fair method of settling disputes."
 
 
 36
 367 F.Supp. at 919 (citations omitted). Accord Newspaper Guild Local 35 v. Washington Post Co., 442 F.2d 1234, 1238 (D.C.Cir.1971). This policy of binding the parties to the record made before an arbitrator is necessary in order to assure the effectiveness of the arbitration awards.
 
 
 37
 We conclude, therefore, that the appellants have waived their right to assert that the Union trustees' proposal contravenes the governing documents since this claim was not presented to the arbitrator. This holding, however, does not preclude the appellants from bringing a separate action against the appellees for breach of their fiduciary duties under ERISA provision 29 U.S.C. Sec. 1109. Cf. Challenger v. Local No. 1, International Ironworkers, 619 F.2d 645, 648 (7th Cir.1980).
 
 
 38
 The judgment of the district court enforcing the arbitration award is accordingly AFFIRMED.
 
 
 39
 NEESE, Senior District Judge, concurring.
 
 
 40
 I agree that ERISA did not require Arbitrator Bowles to be bonded; that the appellants waived their right to assert that p 2 of the proposal of the Union trustees contravened the basic document of the Retirement Plan implicated; and that the judgment of the District Court, enforcing the arbitration-award, should be affirmed. However, I disassociate myself with parts of the reasoning expressed in Part II of the opinion of the majority of the Court:
 
 
 41
 As I view it, the reason ERISA did not require a bond of the Arbitrator was that he not performing any act constituting the "handling" of the Plan's funds or property; so, I would adjudicate the issue of bonding solely and alone upon that ground. Accordingly, I would omit any discussion of the doctrine of arbitral immunity from civil liability which, it seems to me in this present context is redundant.
 
 
 
 *
 The Honorable C.G. Neese, Senior United States District Judge, Eastern District of Tennessee, sitting by designation
 
 
 [1]
 This is the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (hereinafter referred to as UAW International)
 
 
 [2]
 Locals 656 and 985 of the UAW International are the certified collective bargaining representatives of certain hourly employees at Greyhound's Detroit, Michigan garage and terminal facilities, respectively. Russell Nolan is the President of Local 656 and John Ellis is the President of Local 985
 
 
 [3]
 Article III-5 of the trust agreement provides:
 Settlement of Differences. If, by unit vote, the trustees deadlock on any matter arising in connection with this trust agreement or the plan, they shall agree upon a neutral person to serve as an impartial arbitrator to decide the dispute .... The decision of the impartial arbitrator shall be final and binding upon the trustees, the parties to this trust agreement, and the beneficiaries of the trust, but the impartial arbitrator shall not have the power to vary any of the terms of this trust agreement, any collective bargaining agreement, or the plan. Any matters in dispute shall be submitted to the impartial arbitrator in writing. If the trustees cannot jointly agree upon a statement submitting the matter to arbitration, the employer trustees and the UAW trustees shall each prepare and forward in writing their version of the dispute and the question or questions involved.
 
 
 [4]
 The trust agreement empowers the board of trustees to revise benefit levels after taking into account the amount of the increase and the amount of funds available. Article VI-1(d) provides:
 It is contemplated that one or more collective bargaining agreements may provide for the payment of funds by one or more employers to the trustee in excess of the amounts required to fund or finance the benefits then specified by the plan, or that excess funds may otherwise become available, or that it may be desirable to change, increase, decrease, supplement or modify one or more benefits from time to time specified by the plan. Subject always to the foregoing provisions of this article, the trustees shall have exclusive power to amend the plan from time to time in any or all such particulars, except that no benefit may be provided by the trustees under the plan at any time if because of such benefit the actuarial soundness of the trust fund would be impaired (that is to say, the payments to be made by the employers to the trustees pursuant to the terms of collective bargaining agreements between UAW and the employers then in force, plus the then market value of the trust fund, shall be estimated to be inadequate to provide such benefit along with the other benefits specified by the plan) as determined by an actuary selected by the trustees who is not a member of any local of the UAW, is not an employee of any employer and is a Fellow of the Society of Actuaries, or as determined by an a [sic] firm of actuaries selected by the trustees at least one of whose members or officers is a Fellow of the Society of Actuaries, in accordance with sound actuarial practices, assumptions and procedures.
 
 
 [5]
 The Union trustees used an evaluation by Wyatt Company while the Company trustees sought an evaluation from Towers, Perrin, Forster and Crosby (TPF & C). The differences in the proposed benefit increases resulted from the different figures used by the actuarial firms. Wyatt used a retirement age of 63 while TPF & C used 62 as the retirement age. Based on Wyatt's analysis of the benefit improvement, the total cost to the Plan would be 87.8 cents while contributions would be at a rate of 86.863 cents per hour, resulting in a shortfall of 0.87 cents. TPF & C evaluations indicated, however, that a shortfall of 8.95 cents would result from Wyatt's proposed benefit improvements
 
 
 [6]
 The bonding requirement is set forth in 29 U.S.C. Sec. 1112:
 (a) Every fiduciary of an employee benefit plan and every person who handles funds or other property of such a plan (hereafter in this section referred to as "plan official") shall be bonded as provided in this section; ... the amount of such bond shall be fixed at the beginning of each fiscal year of the plan. Such amount shall not be less than ten percentum of the amount of the funds handled. In no case shall such bond be less than One Hundred Thousand Dollars nor more than Five Hundred Thousand Dollars, except that the Secretary after due notice and opportunity for hearing to all the interested parties, and after consideration of the record may prescribe an amount in excess of Five Hundred Thousand Dollars subject to the ten percentum limitation of the preceding sentence.
 
 
 [7]
 When an arbitrator renders his decision, he has fulfilled the obligations of his office and relinquished all power to issue awards binding on the parties. In the absence of a contractual basis for reconsideration of a decision, the arbitrator's decision must stand and a motion for reconsideration must be denied. In Re Kohn Beverage Co., 78 L.A. 1156, 1157 (1982). Accord Expedient Services, Inc., 68 L.A. 1082, 1083-84 (1977)
 
 
 [8]
 Procunier v. Navarette, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978) (prison administrators entitled to qualified immunity); Imbler v. Pachtman, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) (prosecutors entitled to quasi-immunity); O'Connor v. Donaldson, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975) (hospital superintendent entitled to qualified immunity); Wood v. Strickland, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975) (school administrators entitled to qualified immunity); Scheur v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (state executive officials entitled to qualified immunity)
 
 
 [9]
 The Department of Labor has taken the position that an arbitrator would be a plan fiduciary if he performed any of the functions described in the statute which defines the term fiduciary. The Department has issued two advisory opinions which provide us further assistance in our determination of this issue. In Advisory Opinion No. 79-66A, the Department advised the parties that when an arbitrator resolves a dispute regarding whether a plan participant is entitled to pension benefits, he is acting as a fiduciary because a fiduciary's duties include the payment of valid benefit claims and the disallowance of invalid claims. However, in Advisory Opinion No. 78-14, the Department advised that an arbitrator is not a fiduciary when he resolves an issue concerning the employer's monthly contributions to the fund and has the authority to decide on a contribution rate. In the latter opinion, the Department reasoned that the arbitrator did not perform any of the functions described in Sec. 3(21)(A) of ERISA, viz., he had no authority to manage or dispose of plan assets, to render investment advice or to assist in the administration of the plan
 
 
 [10]
 We intimate no viewpoint, however, as to whether the doctrine of arbitral immunity would bar an action for equitable relief as well. Compare Briggs v. Goodwin, 569 F.2d 10, 15 n. 4 (D.C.Cir.1977) (immunity from damages does not bar equitable relief) with Conover v. Montemuro, 477 F.2d 1073, 1094 (3rd Cir.1973) (en banc) (court reserved the question of whether judicial immunity bars injunctive relief)
 
 
 [11]
 Appellants have not raised in their briefs the question of whether arbitral immunity confers a defense to a trustee-fiduciary for actions taken pursuant to an arbitrator's decision. Similarly, we do not address that question in this case
 
 
 [12]
 This section requires a fiduciary to:
 discharge his duties with respect to a plan solely in the interests of the participants and beneficiaries and
 * * *
 (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter.