[No. B159163. Second Dist., Div. One. Aug. 5, 2004.]

SHANEL STASZ, Plaintiff and Appellant, v.
CHARLES R. SCHWAB et al., Defendants and Respondents.,

[No. B162829. Second Dist., Div. One. Aug. 5, 2004.]

SHANEL STASZ, Plaintiff and Appellant, v.
AMERICAN ARBITRATION ASSOCIATION Defendant and Respondent.

[No. B163456. Second Dist., Div. One. Aug. 5, 2004.]

SHANEL STASZ, Plaintiff and Appellant, v.
HUGO W. QUACKENBUSH, Defendant and Respondent.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II.A. and II.C.

**COUNSEL**

Shanel Stasz, in pro. per., for Plaintiff and Appellant.

Howard Rice Nemerovski Canady Falk & Rabkin, Kenneth G. Hausman and Bernard A. Burk for Defendants and Respondents Charles R. Schwab, David S. Pottruck, The Charles Schwab Corporation, Law Offices of Robert Kligman, Robert Kligman, Monika Young, Howard Rice Nemerovski Canady Falk & Rabkin, Kenneth G. Hausman, Bernard A. Burk, Joseph M. Quinn III, Douglas A. Winthrop, Mark A. Sheft and Hugo W. Quackenbush.

Irsfeld, Irsfeld & Younger and C. Phillip Jackson for Defendant and Respondent American Arbitration Association.

## OPINION

**MALLANO, J.**—In these three consolidated appeals, plaintiff Shanel Stasz seeks to avoid the effect of an arbitration provision contained in a settlement agreement to which she and defendant Hugo Quackenbush are parties. We reject all of Stasz's contentions and affirm.

Disagreements arose between Stasz and Quackenbush that were settled by way of a written agreement negotiated by their respective counsel. The agreement mandated the arbitration of all subsequent disputes before the American Arbitration Association (AAA). Disputes later arose. Instead of initiating arbitration, Stasz filed a civil action against Quackenbush. He successfully moved to compel arbitration of the matter before the AAA. He also filed his own claim against Stasz in the arbitration. The arbitrator found in Quackenbush's favor on all claims. The trial court confirmed the arbitration award and entered judgment accordingly. Stasz appeals. In the nonpublished portion of this opinion, we affirm the judgment because Stasz has not shown that the arbitration award should be vacated on any statutory grounds. (See Code Civ. Proc., § 1286.2, subd. (a).)

Stasz filed a separate civil action against, among others, Quackenbush's attorneys, alleging wrongdoing on their part in negotiating and drafting the settlement agreement and in pursuing Quackenbush's claim against her in the arbitration. Relying on a similar theory, Stasz named Quackenbush's employer, The Charles Schwab Corporation (the Schwab firm), as a defendant. The attorneys and the Schwab firm moved to strike the complaint as a "strategic lawsuit against public participation" (SLAPP) (Code Civ. Proc., § 425.16). The trial court granted the motion and entered an order striking the complaint. Stasz appeals. In the nonpublished portion of this opinion, we affirm the order because Stasz sought to impose liability based on conduct protected by the anti-SLAPP statute, and she did not make a sufficient showing that she would prevail at trial.

In the same action, Stasz also sued the AAA, alleging that it had been biased against her and should have stayed the arbitration proceedings pending the outcome of her appeal in a case in which she challenged the arbitration provision. The AAA demurred to the complaint on the ground that, under California common law, it was immune from liability. The trial court sustained the demurrer without leave to amend and ordered the case dismissed. Stasz appeals. In the published portion of this opinion, we, too, conclude that the AAA is immune from liability and affirm.

# I

## BACKGROUND

Quackenbush is an employee of the Schwab firm, a securities broker. He is a longtime friend of the firm's founder, Charles Schwab.[1]

From 1997 to 2000, Stasz and Quackenbush had an intimate relationship. It came to a bitter end. In 2000, he filed an action in San Francisco County Superior Court and obtained a temporary restraining order against her (*Quackenbush v. Stasz* (Super. Ct. S.F. City and County, 2000, No. FL 036974)). She threatened to file a countersuit and embarrass Quackenbush by making public statements about him, Charles Schwab, and the Schwab firm. Stasz claimed to have found embarrassing information while going through Quackenbush's personal papers and effects. She intended to disclose that information generally to the public and also in connection with the pending and contemplated litigation.

Quackenbush and Stasz decided to settle their disputes. Quackenbush was represented by counsel in negotiating a written settlement agreement. Stasz, who has a law degree, was also represented by counsel of her choosing. Several drafts of the agreement were exchanged. Effective May 1, 2000, Stasz and Quackenbush entered into a "Confidential Settlement Agreement and General Release" (settlement agreement or agreement).

The settlement agreement obligated both parties to keep confidential the existence and terms of the agreement and the nature of their disputes. Stasz agreed to make no statement to any third person about Quackenbush, Charles Schwab, the Schwab firm, or the firm's officers or directors, except that she could refer to the Schwab firm in nondisparaging terms. Similarly, Quackenbush agreed to make no statement to any third person about Stasz. Both parties were allowed to state to others that they had been in a relationship together, had disagreements, and parted ways. Neither party was to contact or communicate directly with the other in any way, including by telephone, in person, or in writing. The parties were allowed to contact one another through counsel. Within three days after the execution and delivery of the agreement, each party was to return to the other party all originals and copies of the other party's personal papers.

---

[1] In violation of rule 15(a) of the California Rules of Court, Stasz's statement of facts provides virtually no pertinent citations to the record. Consequently, we do not accept her factual assertions and rely instead on respondents' statement of facts, which is supported by appropriate record references. (See *Board of Administration v. Wilson* (1997) 52 Cal.App.4th 1109, 1154 [61 Cal.Rptr.2d 207]; *Stevens v. Superior Court* (1999) 75 Cal.App.4th 594, 601 fn. 6 [89 Cal.Rptr.2d 370].)

Under the agreement, Quackenbush was to pay Stasz $3,175,000, secured by a deed of trust on an apartment building he owned. An initial payment of $2.5 million was due when Stasz vacated an apartment in that building. Additional payments of $225,000 were to be made on the first, second, and third anniversaries of the agreement's effective date, provided Stasz complied with all of the provisions of the agreement.

The agreement contained an arbitration provision, stating: "Any and all disputes of any kind between the parties, including but not limited to ones arising out of or related to interpretation or enforcement of any provision of this Agreement, shall be resolved by confidential binding arbitration before the [AAA] Large, Complex Commercial Dispute Panel in San Francisco, California before a single neutral arbitrator under the AAA Large, Complex Commercial Dispute Rules and Rules for Emergency Measures of Protection and California law. All aspects of the arbitration (including but not limited to pre-hearing, discovery (if any) and hearing procedures) shall be kept strictly confidential and sealed. The arbitrator shall have the power to award provisional, ancillary, temporary, preliminary and permanent equitable remedies, including but not limited to injunctive relief; but either party may at its option without waiving its right to arbitration hereunder seek injunctive relief from a court with jurisdiction over the parties and the subject matter. The arbitrator's award or awards shall be final and binding, and judgment on any award may be entered in any court having jurisdiction over the parties and the subject matter . . . . All pleadings and other documents in any court proceedings between the parties shall be filed to the extent legally permitted under seal."

Stasz moved out of the apartment, and Quackenbush paid her $2.5 million. In the months that followed, Stasz contacted Quackenbush directly by telephone on several occasions. During some of the calls, Stasz said that, unless Quackenbush gave her more money, she would make statements to third parties that would embarrass him, his colleagues, and the Schwab firm. She also sent letters to the Schwab firm, discussing Quackenbush and the settlement agreement.

On July 24, 2000, Quackenbush initiated arbitration proceedings against Stasz, filing a claim with the AAA and alleging violations of the noncontact and confidentiality provisions of the settlement agreement. Stasz refused to pay her share of the AAA filing fee, so Quackenbush paid it on her behalf. Stasz filed a counterclaim in the arbitration, seeking specific enforcement of the agreement.

Shortly after commencing arbitration, Quackenbush filed an application with the AAA, seeking an interim restraining order against Stasz to stop her from committing further violations of the settlement agreement. The AAA

apppointed a retired superior court judge to serve as arbitrator and hear the application. While the application was pending, Stasz sent Quackenbush's counsel a letter in which she threatened to file suit unless she was paid $50 million. A copy of a draft complaint was attached to the letter.

Stasz stipulated to the entry of an interim restraining order, which was issued on November 30, 2000. Over Stasz's objection, the arbitrator made findings in issuing the order, concluding that the claims asserted in Stasz's draft complaint had to be resolved through arbitration, not in court, and that some of the allegations, if made public, would violate the confidentiality provisions of the settlement agreement. The order directed Stasz to comply with the noncontact and confidentiality terms of the agreement.

On or about November 27, 2000, Stasz filed an action in Los Angeles County Superior Court (*Stasz v. Quackenbush* (Super. Ct. L.A. County, 2000, No. BS066549)) (*Stasz I*), challenging the validity of the arbitration provision in the settlement agreement. She brought a motion to "excise" the arbitration provision, asserting that it was unconscionable. By order dated January 17, 2001, the superior court, Judge Ronald Cappai presiding, denied the motion, finding that "the arbitration clause in the parties' agreement [was] not . . . unconscionable, and [was] fully enforceable." Stasz appealed. We affirmed the order in a nonpublished opinion (*Stasz v. Quackenbush* (Nov. 19, 2002, B147388)).

On June 25, 2001, Stasz filed a second action against Quackenbush (*Stasz v. Quackenbush* (Super. Ct. L.A. County, 2000, No. BC252954)) (*Stasz II*), alleging causes of action for invasion of privacy, breach of fiduciary duty, intentional infliction of emotional distress, fraud, and deceit. Stasz also sought injunctive relief. The complaint alleged that Quackenbush had contacted Stasz directly, asking her to modify the settlement agreement in certain respects, and that, when she refused, he threatened to embarrass her by publicly disclosing private information about her. The complaint was based on the same claims that had appeared in Stasz's draft complaint— claims that, under the arbitrator's interim restraining order, were to be pursued through arbitration, not in court.

On August 10, 2001, Quackenbush filed a motion to compel arbitration in *Stasz II*, relying on the arbitration provision in the settlement agreement. Stasz filed opposition papers. By order dated October 12, 2001, the trial court, Judge Marvin M. Lager presiding, granted the motion and stayed the action pending the outcome of arbitration.

In December 2001, Stasz filed an ex parte application in the trial court, seeking to stay the arbitration proceedings until the resolution of her appeal

in *Stasz I*, which challenged the validity of the arbitration provision. The trial court denied the application. In June 2002, Stasz sought another stay on the same basis, failing again. Stasz also sought a stay from the arbitrator, who denied it.

On December 21, 2001, Stasz sent a letter to the Schwab firm containing statements about Quackenbush, the settlement agreement, the parties' disputes, and the pending arbitration. Some of the statements about Quackenbush were inaccurate and disparaging.

On January 18, 2002, Stasz filed a third lawsuit (*Stasz v. Schwab* (Super. Ct. L.A. County, 2002, No. BC266691)) (*Stasz III*), alleging causes of action against, among others, Quackenbush's attorneys, Charles Schwab, the Schwab firm, and the AAA. In the first cause of action, Stasz alleged that Quackenbush's attorneys had committed fraud by using vague and ambiguous terms in negotiating and drafting the settlement agreement and, with the exception of one attorney, by pursuing an arbitration claim against her. In a cause of action denominated "tortious interference," Stasz alleged that Quackenbush's attorneys had interfered with her rights under the settlement agreement by filing vexatious litigation against her. In a cause of action for conspiracy to commit fraud, she asserted that all defendants had engaged in various wrongful acts in connection with the drafting of the settlement agreement and the handling of the arbitration proceedings. For example, she alleged that the AAA was biased against her and should have stayed the arbitration proceedings while she pursued an appeal in *Stasz I*.[2] In the final cause of action, for intentional infliction of emotional distress, the complaint alleged that defendants had engaged in outrageous conduct in causing Quackenbush to breach the settlement agreement.

On February 15, 2002, in *Stasz III*, all of the defendants with the exception of the AAA filed a special motion to strike the complaint under the anti-SLAPP statute (Code Civ. Proc., § 425.16), arguing that the complaint was based on "act[s] . . . in furtherance of the . . . right of petition or free speech . . . in connection with a public issue . . ." (*id.*, subd. (b)(1)) and that Stasz had not "established that there [was] a probability that [she] will prevail

---

[2] To be more specific, the alleged wrongful acts included: (1) designating the AAA as the arbitral forum even though an attorney at the law firm representing Quackenbush—an attorney who had no involvement in the Stasz matters—occasionally served as an arbitrator for the AAA and was an acquaintance of the arbitrator in this case; (2) failing to disclose to Stasz that the AAA "sell[s] memberships for $50,000 to large law firms," including the firm representing Quackenbush; (3) Quackenbush's contention that Stasz did not return all of his personal papers to him; (4) conducting arbitration proceedings while Stasz's appeal in *Stasz I*—challenging the validity of the arbitration provision—was pending before this court; and (5) holding the arbitration hearing after Stasz—who received proper notice of the hearing—indicated that she would not attend.

on the claim" (*ibid.*). (All further statutory references are to the Code of Civil Procedure unless otherwise indicated.)

Stasz filed opposition papers to the anti-SLAPP motion and submitted evidence to support the allegations of the complaint. Defendants filed general and specific objections to the evidence. By order dated March 28, 2002, the trial court, Judge Victor H. Person presiding, sustained all of defendants' specific objections and granted the anti-SLAPP motion. The trial court later awarded defendants $43,720 in attorneys' fees. (See § 425.16, subd. (c).) Stasz appeals (B159163).

On June 5, 2002, the AAA demurred to the complaint in *Stasz III*, contending that, as the organization "sponsoring" the arbitration, it is immune from liability under California common law. Stasz filed opposition papers. By order dated August 30, 2002, the trial court, Judge Lager presiding, sustained the demurrer without leave to amend and dismissed the case. Stasz appeals (B162829).

Meanwhile, Quackenbush's arbitration claim against Stasz and her counter-claim against him, which were filed directly with the AAA, and her claims against him in *Stasz II*, which the trial court ordered to arbitration, came before the arbitrator for hearing by way of Quackenbush's "Motion for Judgment on All Claims and Counterclaims." Although Stasz had actively participated in the early months of the arbitration proceedings, she chose not to attend the hearing on Quackenbush's motion, notwithstanding proper notice. Nor did she submit any evidence. In Stasz's absence, the arbitrator required Quackenbush to present evidence in support of his claim.

On July 31, 2002, the arbitrator issued a final award, finding in Quackenbush's favor on all claims. As recited in the award, Stasz breached the settlement agreement by: (1) directly contacting Quackenbush and threatening to make embarrassing statements about him to third parties; (2) filing suit against Quackenbush (*Stasz II*) instead of pursuing her claims through arbitration; (3) making allegations in the *Stasz II* complaint that violated the confidentiality provisions of the agreement and that were unnecessary to plead her causes of action; (4) sending a letter to the Schwab firm on December 21, 2001, that contained inaccurate and disparaging assertions about Quackenbush; and (5) filing another suit related to the agreement (*Stasz III*) in which she made unnecessary, disparaging remarks about Quackenbush, the Schwab firm, and some of the firm's officers.

The award further stated: "[Quackenbush] has been embarrassed before his colleagues at work, one of whom[, Charles Schwab,] is a lifelong personal friend . . . . [H]e has suffered personal humiliation, emotional anguish and

anxiety in his personal and professional life . . . . [¶] . . . [¶] . . . [Quackenbush] has also suffered further injury in the form of a substantial diminution of the value of the [Settlement] Agreement to him. The Agreement expressly provides that [Stasz] 'acknowledges and agrees that if she fails to satisfy strictly any one or more [of . . . her noncontact and confidentiality obligations] this Agreement loses much or all of its value to [Quackenbush] . . . and that any failure strictly and continuously to comply with [those] obligations . . . shall, without further notice or demand, also constitute and be treated as a material breach of this Agreement, entitling [Quackenbush] to any remedies that may be available at law or in equity, including damages and injunctive relief . . . .' "

The arbitrator granted various forms of declaratory and injunctive relief, including the declaration that Quackenbush was excused from making further payments under the agreement and an injunction enforcing the agreement's noncontact and confidentiality provisions against Stasz. The arbitrator awarded Quackenbush approximately $1.5 million in damages and costs.

Quackenbush and Stasz then returned to the trial court (*Stasz II*), which had ordered the arbitration of Stasz's claims. Quackenbush moved to confirm the arbitration award, and Stasz moved to vacate it. On September 30, 2002, the trial court, Judge Lager presiding, confirmed the award in its entirety and entered judgment accordingly. Stasz appeals (B163456).

By order dated January 2, 2003, we ordered the consolidation of all three appeals for purposes of briefing, oral argument, and decision.

## II

## DISCUSSION

We examine the trial court's rulings in the order in which they were made: (1) granting the anti-SLAPP motion and dismissing Stasz's civil action as to Quackenbush's attorneys and the Schwab defendants; (2) sustaining the demurrer of the AAA without leave to amend; and (3) confirming the arbitration award in Quackenbush's favor.

A. *The Anti-SLAPP Motion**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

B. *The AAA's Demurrer*

In *Stasz III*, the AAA's demurrer was based on the doctrine of arbitral immunity as established under California common law. The trial court

---

*See footnote, *ante*, page 420.

sustained the demurrer without leave to amend. We conclude that the AAA enjoys common law immunity because, just as an arbitrator is immune from liability for bias or the failure to stay arbitration proceedings, so is the organization that sponsors the arbitration.

Stasz contends that arbitral immunity does not apply because the AAA was biased against her. In support of that contention, she states: (1) the AAA accepted a payment from Quackenbush to cover her portion of the AAA filing fee after she refused to pay it; (2) the arbitrator was familiar with an attorney at the law firm representing Quackenbush (see fn. 2, *ante*); and (3) the AAA sold memberships to law firms, including the firm representing Quackenbush.[5]

Stasz also argues against immunity on the theory that the AAA should not have gone forward with the arbitration proceedings while her appeal in *Stasz I*—which challenged the validity of the arbitration provision—was pending in this court. As Stasz sees it, the arbitration was automatically stayed during the appeal. (See § 916, subd. (a) [in general, perfecting of appeal stays proceedings in trial court with respect to order or judgment from which appeal is taken].)

### 1. *Common Law Immunity for Arbitrators*

As our Supreme Court has stated: " 'Arbitrators are judges chosen by the parties to decide the matters submitted to them . . . .' . . . Arbitrators have been extended the protection of judicial immunity, because they perform ' "the function of resolving disputes between parties, or of authoritatively adjudicating private rights." ' " (*In re Marriage of Assemi* (1994) 7 Cal.4th 896, 909 [30 Cal.Rptr.2d 265, 872 P.2d 1190], citation omitted.) "It long has been recognized that, in private arbitration proceedings, an arbitrator enjoys the benefit of an arbitral privilege [of immunity] because the role that he or she exercises is analogous to that of a judge. . . . 'There is hardly any aspect of arbitration law and practice more settled, both in domestic and international relations, than the immunity of arbitrators from court actions for their activities in arriving at their award.' . . . This rule—immunizing arbitrators in private contractual arbitration proceedings from tort liability—is well established in California." (*Moore v. Conliffe* (1994) 7 Cal.4th 634, 650 [29 Cal.Rptr.2d 152, 871 P.2d 204], citations omitted.)

Dating back to 1983, Division Three of this district stated: "Courts of this country have long recognized immunity to protect arbitrators from civil

---

[5] In *Stasz I*, Stasz argued that the arbitration provision was unconscionable because the AAA was biased. The superior court rejected that argument. On appeal, so did we. (See *Stasz v. Quackenbush, supra*, B147388, pp. 3–9.)

liability for actions taken in the arbitrator's quasi-judicial capacity . . . . Arbitral immunity, like judicial immunity, promotes fearless and independent decision making . . . . To this end, the courts have refused to hold judges and arbitrators liable for their judicial actions . . . . 'If [the arbitrators'] decisions can thereafter be questioned in suits brought against them by either party, there is a real possibility that their decisions will be governed more by the fear of such suits than by their own unfettered judgment as to the merits of the matter they must decide.' " (*Baar v Tigerman* (1983) 140 Cal.App.3d 979, 982–983 [189 Cal.Rptr. 834, 211 Cal.Rptr. 426] (*Baar*), citations omitted; accord, *Coopers & Lybrand v. Superior Court* (1989) 212 Cal.App.3d 524, 534 [260 Cal.Rptr. 713].)

A decade later, Division Seven of this district observed: "Arbitration has evolved into a favored method for the resolution of disputes. . . . The California Legislature has found arbitration to be an efficient method of relieving the burden on the congested court system. . . . California courts have similarly viewed arbitration with favor. . . .

"This strong policy has created the need for independent judgments which are free from fear of legal action. . . . Arbitral immunity furthers this need . . . . '[T]he independence necessary for principled and fearless decision-making' is best achieved by shielding persons involved in the arbitral process from '. . . intimidation caused by the fear of a lawsuit' arising out of the exercise of arbitral functions. . . .

"The existence of arbitral immunity is also in part due to the resemblance of arbitration proceedings to judicial proceedings. . . . '[A]lthough arbitration is a proceeding different from a court proceeding and the functions performed by the arbitrator are somewhat different from those of the judge, arbitration is as much an adjudicatory process as the judicial process.' . . . This comparability in functions creates a similar necessity for independence in decision-making. . . . Thus, it is reasonable to use arbitral immunity just as judicial immunity does in the judicial arena, to protect the decisionmaking process from reprisals by dissatisfied litigants." (*Thiele v. RML Realty Partners* (1993) 14 Cal.App.4th 1526, 1531 [18 Cal.Rptr.2d 416] (*Thiele*), citations omitted.)

■ The application of arbitral immunity does not turn on whether the act at issue is discretionary instead of ministerial or administrative: " '[S]emantically categorizing the challenged act[] as "ministerial" or administrative, as opposed to "discretionary," in large part misses the mark, since the scope of arbitral immunity is "defined by the *functions* it protects and serves." ' " (*Thiele, supra,* 14 Cal.App.4th at p. 1530, italics in original.) "Arbitral immunity shields all functions which are 'integrally related to the arbitral

process.' . . . [A]rbitrators . . . are exempt from civil liability for failure to exercise care or skill in the performance of their arbitral functions." (*Ibid.*, citations omitted.)

Federal cases are in agreement. "The functional comparability of the arbitrators' decision-making process and judgments to those of judges . . . generates the same need for independent judgment, free from the threat of lawsuits. Immunity furthers this need. As with judicial and quasi-judicial immunity, arbitral immunity is essential to protect the decision-maker from undue influence . . . . The extension of immunity to arbitrators where arbitration is pursuant to a private agreement between the parties is especially compelling because arbitration is the means selected by the parties themselves for disposing of controversies between them. By immunizing arbitrators and their decisions from collateral attacks, arbitration as the contractual choice of the parties is respected yet the arbitrators are protected. Arbitrators have no interest in the outcome of the dispute and should not be compelled to become parties to that dispute. . . . '[I]ndividuals cannot be expected to [serve as arbitrators] if they can be caught up in the struggle between the litigants and saddled with the burdens of defending a lawsuit.' " (*Corey v. New York Stock Exchange* (6th Cir. 1982) 691 F.2d 1205, 1211, citations omitted; accord, *Austern v. Chicago Bd. Options Exchange, Inc.* (2d Cir. 1990) 898 F.2d 882, 885–886; *Wasyl, Inc. v. First Boston Corp.* (9th Cir. 1987) 813 F.2d 1579, 1582.)

Under federal law, "[a]rbitral immunity protects all acts within the scope of the arbitral process." (*Olson v. National Ass'n of Security Dealers* (8th Cir. 1996) 85 F.3d 381, 383; accord, *Intern. Medical Group, Inc. v. American Arbitration* (7th Cir. 2002) 312 F.3d 833, 843.) "[A]rbitrators in contractually agreed upon arbitration proceedings are absolutely immune from liability in damages for all acts within the scope of the arbitral process." (*Austern v. Chicago Bd. Options Exchange, Inc.*, *supra*, 898 F.2d at p. 886.)

Federals courts have held that, as with judicial immunity, arbitral immunity applies unless there is a clear absence of jurisdiction (see *Intern. Medical Group, Inc. v. American Arbitration*, *supra*, 312 F.3d at pp. 842–844; *New England Cleaning v. American Arbitration Ass'n* (1st Cir. 1999) 199 F.3d 542, 545; *Larry v. Penn Truck Aids, Inc.* (E.D.Pa. 1982) 94 F.R.D. 708, 724) or the arbitrator engages in acts that fall outside his or her arbitral capacity (see *Cort v. American Arbitration Ass'n* (N.D.Cal. 1992) 795 F.Supp. 970, 972; *Mireles v. Waco* (1991) 502 U.S. 9, 11, 116 L.Ed.2d 9, 112 S.Ct. 286; see generally Nolan & Abrams, *Arbitral Immunity* (1989) 11 Indus. Rel. L.J. 228, 235–254, (hereafter *Arbitral Immunity*)). Even corrupt or biased acts are subject to immunity. (See *Intern. U., United Auto. Wkrs. v. Greyhound Lines* (6th Cir. 1983) 701 F.2d 1181, 1185–1187; *Montero v. Travis* (2d Cir. 1999)

171 F.3d 757, 761; *Saavedra v. City of Albuquerque* (D.N.M. 1994) 859 F.Supp. 526, 532, affd. (10th Cir. 1996) 73 F.3d 1525.)

### 2. *Common Law Immunity for Organizations Sponsoring Arbitrations*

■ California courts have extended arbitral immunity to organizations that sponsor arbitrations, like the AAA. As we stated in *American Arbitration Assn. v. Superior Court* (1992) 8 Cal.App.4th 1131 [10 Cal.Rptr.2d 899]: "[A] refusal to extend immunity to the sponsoring organization would make the arbitrator's immunity illusory. Stated otherwise, it would shift liability rather than extinguish it. . . . [¶] . . . [¶] As a practical matter, a grant of immunity to the arbitrator must be accompanied by a grant of the same immunity to the AAA, an entity as indispensable to the arbitrator's job of arbitrating as are the courts to the judge's job of judging." (*Id.* at pp. 1133–1134, citations omitted.) " 'Extension of arbitral immunity to encompass boards which sponsor arbitration is a natural and necessary product of the policies underlying arbitral immunity . . . .' " (*Olney v. Sacramento County Bar Assn.* (1989) 212 Cal.App.3d 807, 814 [260 Cal.Rptr. 842].) "[C]ourts have on the whole extended arbitral immunity to sponsoring organizations." (*Thiele, supra,* 14 Cal.App.4th at p. 1529.)

Federal courts have reached the same conclusion. As the Sixth Circuit Court of Appeals stated: "Our decision to extend immunity to . . . the boards which sponsor arbitration finds support in the case law, the policies behind the doctrines of judicial and quasi-judicial immunity and policies unique to contractually agreed upon arbitration proceedings." (*Corey v. New York Stock Exchange, supra,* 691 F.2d at p. 1209.) According to the First Circuit, "[i]n proper circumstances, organizations that sponsor arbitrations, as well as arbitrators themselves, enjoy . . . immunity from civil liability." (*New England Cleaning v. American Arbitration Ass'n, supra,* 199 F.3d at p. 545.) And another federal court has commented: "[A]rbitral immunity is not limited to the individual arbitrators. It has been uniformly accepted that such immunity extends to arbitration associations such as the AAA as well." (*Cort v. American Arbitration Ass'n, supra,* 795 F.Supp. at p. 971; see *U.S. v. City of Hayward* (9th Cir. 1994) 36 F.3d 832, 838 [arbitral immunity afforded sponsoring organizations does not apply to municipality that, by ordinance, requires property owners to arbitrate rent control issues before arbitrators chosen by municipality].)

Under federal law, a sponsoring organization is immune from liability in situations where the arbitrator is or would be immune and also where the organization has engaged in tasks such as selecting an arbitrator, scheduling a hearing, giving notice of a hearing, and billing for services. (See *Corey v. New York Stock Exchange, supra,* 691 F.2d at p. 1211; *New England*

*Cleaning v. American Arbitration Ass'n, supra*, 199 F.3d at p. 545.) This is so even if the sponsoring organization has violated its own internal rules. (See *Olson v. National Ass'n of Security Dealers, supra*, 85 F.3d at pp. 382–383.)

### 3. *California Statutory Law*

In California, state law on the subject of arbitral immunity was governed, at least in part, by statute from 1986 to 1997. Enacted in 1985 and effective January 1, 1986, section 1280.1 read: "An arbitrator has the immunity of a judicial officer from civil liability when acting in the capacity of arbitrator under any statute or contract." (Stats. 1985, ch. 709, § 1, p. 2341.) By its own terms, section 1280.1 was to "remain in effect only until January 1, 1991, and as of that date is repealed, unless a later enacted statute, which is enacted before January 1, 1991, deletes or extends that date." (*Ibid.*)

In 1990, the Legislature amended section 1280.1 by adding an additional paragraph, as follows: "The immunity afforded by this section shall supplement, and not supplant, any otherwise applicable common law or statutory immunity." (Stats. 1990, ch. 817, § 2, p. 3599.) At the same time, the Legislature extended section 1280.1's date of repeal to January 1, 1996. (*Ibid.*) In 1995, the Legislature extended the life of the statute for another year, to January 1, 1997. (Stats. 1995, ch. 209, § 2, p. 749.) No further extensions were approved. Section 1280.1 was therefore repealed by operation of law on January 1, 1997—more than three years before the Quackenbush-Stasz arbitration began.[6]

To understand the effect of section 1280.1 on this case, we look to the purpose of the statute. (See *Pacific Gas & Electric Co. v. County of Stanislaus* (1997) 16 Cal.4th 1143, 1152 [69 Cal.Rptr.2d 329, 947 P.2d 291]; *TrafficSchoolOnline, Inc. v. Clarke* (2003) 112 Cal.App.4th 736, 740 [5 Cal.Rptr.3d 408].) Section 1280.1 was enacted to overrule the decision in *Baar, supra*, 140 Cal.App.3d 979, where the court held that an arbitrator and a sponsoring organization (the AAA) were *not* entitled to the same immunity as a judge and could be found liable for breach of contract where the arbitrator failed to make a timely award. In *Baar*'s wake, the Legislature enacted section 1280.1 to expand arbitral immunity to conform to judicial immunity. (See *Moore v. Conliffe, supra*, 7 Cal.4th at p. 655–656; *American Arbitration Assn. v. Superior Court, supra*, 8 Cal.App.4th at p. 1133; *Coopers & Lybrand v. Superior Court, supra*, 212 Cal.App.3d at pp. 534–535.)

---

[6] Although section 1280.1 was repealed, similar immunity statutes remain in effect for other types of arbitrations. (See, e.g., § 1297.119 [international commercial dispute arbitrations]; Bus. & Prof. Code, § 6200, subd. (f) [attorney-client fee dispute arbitrations].)

In *Baar*, the parties' agreement mandated that they arbitrate disputes pursuant to the rules of the AAA, which required that an arbitration award be made no later than 30 days after the close of the hearings unless otherwise agreed by the parties or specified by law. (See *Baar, supra*, 140 Cal.App.3d at p. 981 & fns. 2, 3; § 1283.8.) An arbitration was demanded and a hearing conducted. The AAA requested and received an extension of three and one-half months within which to issue the award. But the arbitrator never issued one. Seven months after the case was submitted, the arbitrator lost jurisdiction over the matter. (*Baar, supra*, 140 Cal.App.3d at pp. 981–982 & fn. 4; § 1283.8.)

The parties to the arbitration filed a civil action against the arbitrator and the AAA, alleging breach of contract and other causes of action. The trial court dismissed the action on demurrer, concluding that arbitral immunity barred the suit. The Court of Appeal reversed, explaining: "Cases in which courts have clothed arbitrators with immunity have involved disgruntled litigants who sought to hold an arbitrator liable for *alleged misconduct in arriving at a decision. . . .* By contrast, the present case involves [the arbitrator's] *failure to make an award* without any allegation of misconduct . . . . [¶] [Defendants'] contention that this court should *extend* immunity to an arbitrator who never renders an award fails to appreciate the nature of the arbitrator-party relationship and misperceives the policy underlying arbitral immunity." (*Baar, supra*, 140 Cal.App.3d at p. 983, italics in original.)

The *Baar* court noted that arbitrations and judicial proceedings differ in many respects, giving as examples: a judge receives power from the Constitution; an independent judiciary is essential to the preservation of democracy; trials are public in nature; judges must follow the law; arbitration decisions carry little, if any, precedential value; and arbitrations determine only the rights and obligations of the parties to the arbitration and do not decide any questions not presented by the parties' submission. (*Baar, supra*, 140 Cal.App.3d at p. 984.)

Based on this analysis, the court concluded that, while a judge is immune from liability for failing to render a decision (see *Baar, supra*, 140 Cal.App.3d at p. 983, discussing *Wyatt v. Arnot* (1907) 7 Cal.App. 221 [94 P. 86]), an arbitrator should not be immune for failing to issue an award (see *Baar, supra*, 140 Cal.App.3d at pp. 983–986). As the court put it, "arbitration is contractual in nature and [the] breach of an arbitration contract will result in a cause of action to the damaged party." (*Id.* at p. 985.) Indeed, the court went so far as to suggest that corruption on the part of an arbitrator might give rise to liability for breach of the covenant of good faith and fair dealing inherent in the contract between the arbitrator and the parties. (*Ibid.*) According to the court, "[w]hile we must protect an arbitrator acting in a quasi-judicial

capacity, we must also uphold the contractual obligations of an arbitrator to the parties involved." (*Ibid.*, italics omitted.)

Finally, the court in *Baar* reasoned that, because the arbitrator was not immune from suit, the AAA did not derive any immunity from him. (*Baar*, *supra*, 140 Cal.App.3d at p. 986.) In addition, the court stated that the liability of the AAA was justifiable because it was based on the association's improper administration of the arbitration proceedings, as opposed to the AAA's performance of a discretionary act or its involvement in the decision-making process, for example, in deciding whether the arbitrator had a conflict of interest or should be disqualified. (*Id.* at pp. 986–987.)

Against this backdrop, the Legislature enacted section 1280.1 to ensure that arbitrators enjoyed the same immunity as judges and could not be held liable for breach of an arbitration provision. As stated, section 1280.1 was repealed before the Quackenbush-Stasz arbitration commenced, leaving arbitral immunity to be determined under California common law. (See 79 Ops.Cal.Atty.Gen. 294 (1996) [discussing common law immunity of arbitrators].)

### 4. *Contractual Liability for Breach of an Arbitration Provision*

■ Here, the arbitration provision required the appointment of "a single *neutral* arbitrator." (Italics added.) Stasz contends that, under *Baar*, she can maintain an action against the AAA for allegedly failing to provide an unbiased decision maker. (See *Arbitral Immunity*, *supra*, 11 Indus. Rel. L.J. at pp. 238–239 [discussing neutral and partisan arbitrators]; Knight et al., Cal. Practice Guide: Alternative Dispute Resolution (The Rutter Group 2003) ¶ 5:39.1, p. 5–26 [the effect of repeal of section 1280.1 on the common law is presently unclear].) We conclude that an arbitrator and a sponsoring organization are immune from liability for bias. Another remedy exists for that type of wrong.

As reflected in the 1990 amendment, section 1280.1 did not purport to affect arbitral immunity under the common law. Quite the opposite, the statute expressly stated that it was intended to supplement, not supplant, common law rules. And "the common law is not static." (*Flournoy v. State* (1964) 230 Cal.App.2d 520, 535 [41 Cal.Rptr. 190]; see *Otsuka v. Hite* (1966) 64 Cal.2d 596, 609, fn. 10 [51 Cal.Rptr. 284, 414 P.2d 412].) Thus, section 1280.1 did not preclude changes in the common law. " 'The inherent capacity of the common law for growth and change is its most significant feature. Its development has been determined by the social needs of the community which it serves. It is constantly expanding and developing . . . .' " (*Rodriguez v. Bethlehem Steel Corp.* (1974) 12 Cal.3d 382, 394 [115 Cal.Rptr. 765, 525 P.2d 669].) "[I]n the common law system the primary

instruments of this evolution are the courts, adjudicating on a regular basis the rich variety of individual cases brought before them." (*Ibid.*)

As one commentator has explained: "[T]he court [in *Baar*] appeared to say that, unlike a judge, an arbitrator has entered into a contractual relationship with the parties to a dispute. Therefore, even though the arbitrator is immune from liability for quasi-judicial acts, she nonetheless has contractual duties that may form the basis for a valid cause of action. This reasoning is logically coherent. Nevertheless, virtually any claim of misconduct in arriving at a decision can be stated as a breach of the implied covenant of good faith and fair dealing. Arbitral immunity could thus be effectively circumvented in most, if not all, cases by labeling the wrong as a contract breach. This is contrary, however, to the court's recognition of the importance arbitral immunity plays in protecting the arbitrator's 'fearless and independent decision making.' Arbitrators need to be protected against vexatious suits brought without merit." (Note, *Redefining Arbitral Immunity: A Proposed Qualified Immunity Statute for Arbitrators* (1993) 44 Hastings L.J. 421, 430 (hereafter Note), fn. omitted.)

According to commentators, *Baar* is best understood to mean that "[a]n arbitrator should not expect to be immune from liability for failure to perform . . . . [¶] . . . Immunity . . . should extend to arbitrators who are merely tardy [in issuing an award] as well as to those who are otherwise negligent; it should not protect the arbitrator who completely fails to do his job." (*Arbitral Immunity, supra,* 11 Indus. Rel. L.J. at pp. 253–254; see *id.* at pp. 251–254.) Under *Baar,* "arbitrators may be held liable for complete nonperformance of their contract with the parties. Anything short of complete nonperformance would be protected by arbitral immunity." (Note, *supra,* 44 Hastings L.J. at p. 430; see *Caudle v. American Arbitration Ass'n* (7th Cir. 2000) 230 F.3d 920, 922 [AAA might be subject to liability if parties pay arbitration fee, and AAA does not arbitrate their dispute]; *E.C. Ernst, Inc. v. Manhattan Const. Co. of Texas* (5th Cir. 1977) 551 F.2d 1026, 1033, opn. mod. 559 F.2d 268 [depending on circumstances, arbitrator may lose immunity where he or she fails to issue an award].)

And *Baar*'s distinction between a sponsoring organization's discretionary acts—to which immunity applies—and its administrative acts—to which immunity purportedly does not apply—is at odds with subsequent case law. (See *Thiele, supra,* 14 Cal.App.4th at p. 1530; *New England Cleaning v. American Arbitration Ass'n, supra,* 199 F.3d at p. 545; *Austern v. Chicago Bd. Options Exchange, Inc., supra,* 898 F.2d at pp. 886–887.)

## 5. *The Remedy for Bias*

In this case, we do not deal with the failure to issue an arbitration award but with an accusation that the arbitrator and the sponsoring organization were biased. In discussing judicial immunity over a century ago, the United States Supreme Court explained: "Nor can [the] exemption of the judges from civil liability be affected by the motives with which their judicial acts are performed. The purity of their motives cannot . . . be the subject of judicial inquiry. . . .

"The truth of this latter observation is manifest to all persons having much experience with judicial proceedings in the superior courts. Controversies involving not merely great pecuniary interests, but the liberty and character of the parties, and consequently exciting the deepest feelings, are being constantly determined in those courts, in which there is great conflict in the evidence and great doubt as to the law which should govern their decision. It is this class of cases which impose[s] upon the judge the severest labor, and often create[s] in his mind a painful sense of responsibility. Yet it is precisely in this class of cases that the losing party feels most keenly the decision against him, and most readily accepts anything but the soundness of the decision in explanation of the action of the judge. . . . If civil actions could be maintained in such cases against the judge, because the losing party should see fit to allege in his complaint that the acts of the judge were done with partiality, or maliciously, or corruptly, the protection essential to judicial independence would be entirely swept away." (*Bradley v. Fisher* (1871) 80 U.S. 335, 347–348 [20 L.Ed. 646].) This analysis is of equal importance in the context of arbitrations and arbitral immunity.

As federal courts have held, an arbitrator is immune from liability for "partiality," or bias. (See *Intern. U., United Auto. Wkrs. v. Greyhound Lines*, *supra*, 701 F.2d at pp. 1185–1187; *Montero v. Travis*, *supra*, 171 F.3d at p. 761; *Saavedra v. City of Albuquerque*, *supra*, 859 F.Supp. at p. 532.) But that is not to say that an aggrieved party is without recourse. By statute, federal law mandates that an arbitration award be vacated in the event of bias. (See 9 U.S.C. § 10(a)(2).)

Thus, "[a] party alleging a due process violation in the conduct of the [arbitration] proceedings, fraud, misconduct, a violation of public policy, . . . etc., by arbitrators should pursue remedies against the 'real' adversary through the . . . process [of challenging the arbitration award]. To allow a collateral attack against arbitrators and their judgments would also emasculate the . . . provisions of the federal Arbitration Act." (*Corey v. New York Stock Exchange*, *supra*, 691 F.2d at p. 1211.) The remedy for arbitrator bias or misconduct is a civil action seeking to vacate the arbitration award. (See

*Olson v. National Ass'n of Security Dealers, supra,* 85 F.3d at p. 383; *Honn v. National Ass'n of Securities Dealers, Inc.* (8th Cir. 1999) 182 F.3d 1014, 1017–1018; *In re A.H. Robins Co.* (E.D.Va. 1998) 219 B.R. 135, 142–144, affd. mem. (4th Cir. 1998) 166 F.3d 331; *Brandon, Jones, Sandall v. MedPartners, Inc.* (S.D.Fla. 2001) 203 F.R.D. 677, 688, affd. in part, app. dism. in part (11th Cir. 2002) 312 F.3d 1349; 9 U.S.C. § 10(a)(2).)

Commentators are in accord with federal law: "Once the arbitrator renders an award, his role is finished. The proper challenge to an award is an action to vacate it brought against the other party, the real adversary, not against the arbitrator . . . . [T]he arbitrator is not a proper party in a suit over the award and has no interest in the dispute once the award is rendered. Given this lack of interest, judicial economy requires dismissal of the unnecessary party. Dragging arbitrators into subsequent litigation would drastically interfere with their recruitment and independence." (*Arbitral Immunity, supra,* 11 Indus. Rel. L.J. at p. 242, fns. omitted.)

■ California courts often look to federal law in deciding arbitration issues under state law. (See, e.g., *Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 101–103, 107–111 [99 Cal.Rptr.2d 745, 6 P.3d 669]; *Pour Le Bebe, Inc. v. Guess? Inc.* (2003) 112 Cal.App.4th 810, 829–835 [5 Cal.Rptr.3d 442]; *Alan v. Superior Court* (2003) 111 Cal.App.4th 217, 224–230 [3 Cal.Rptr.3d 377].) Like federal law, California law provides that arbitrator bias is grounds for vacating an arbitration award. (See § 1286.2, subd. (a)(1)–(3), formerly subds. (a)–(c); *Reed v. Mutual Service Corp.* (2003) 106 Cal.App.4th 1359, 1370 [131 Cal.Rptr.2d 524]; *Betz v. Pankow* (1995) 31 Cal.App.4th 1503, 1506–1508 [38 Cal.Rptr.2d 107]; *Michael v. Aetna Life & Casualty Ins. Co.* (2001) 88 Cal.App.4th 925, 936–940 [106 Cal.Rptr.2d 240]; *Ray Wilson Co. v. Anaheim Memorial Hospital Assn.* (1985) 166 Cal.App.3d 1081, 1087 [213 Cal.Rptr. 62] & fn. 3, disapproved on another point in *Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 27–28 [10 Cal.Rptr.2d 183, 832 P.2d 899].)[7]

■ A suit against an arbitrator or a sponsoring organization is nothing more than a collateral attack on the arbitration award. (See *Corey v. New York Stock Exchange, supra,* 691 F.2d at pp. 1211–1213.) And, under state law, the

---

[7] Under federal and state law, an arbitration award must be vacated if the arbitrator fails to disclose any dealings that might create an impression of possible bias. (See *Reed v. Mutual Service Corp., supra,* 106 Cal.App.4th at p. 1370; *Michael v. Aetna Life & Casualty Ins. Co., supra,* 88 Cal.App.4th at pp. 936–940; *Ray Wilson Co. v. Anaheim Memorial Hospital Assn., supra,* 166 Cal.App.3d at p. 1087; see also §§ 1286.2, subd. (a)(6), 1281.91, subd. (a), 1281.9, subd. (a)(2); Cal. Rules of Court, appen., div. VI, Ethics Standards for Neutral Arbitrators in Contractual Arbitration, 23 pt. 2 West's Ann. Court Rules (2004 supp.) pp. 604–620; *International Alliance of Theatrical Stage Employees, etc. v.* Laughon (2004) 118 Cal.App.4th 1380, 1385–1387, 1392–1394 [14 Cal.Rptr.3d 341].)

exclusive means of attacking an award is by way of a petition to vacate the award, as provided in the California Arbitration Act. (§§ 1280–1294.2; see *A.M. Classic Construction, Inc. v. Tri-Build Development Co.* (1999) 70 Cal.App.4th 1470, 1475 [83 Cal.Rptr.2d 449].)

■ Finally, under *Baar, supra,* 140 Cal.App.3d 979, any bias on the part of an arbitrator or sponsoring organization is akin to "misconduct in arriving at a decision" (*id.* at p. 983, italics omitted)—misconduct for which, as *Baar* recognized, "courts have clothed arbitrators with immunity" (*ibid.*). "[B]y its own terms *Baar* does not apply to the facts of this case, where the allegation is of error in reaching a result, not in the total failure to reach a decision." (*Olney v. Sacramento County Bar Assn., supra,* 212 Cal.App.3d at p. 814.)

■ Accordingly, we hold that bias in the arbitration process should be remedied by challenging the arbitration award, not by seeking to impose liability on the arbitrator or the sponsoring organization.

Other state courts have come to the same conclusion. In *L & H Airco, Inc. v. Rapistan Corp.* (Minn. 1989) 446 N.W.2d 372, the Minnesota Supreme Court stated: "Failure to disclose possible conflicts of interest creates at the least an impression of bias. An impression of bias contaminates the decision making process when neutrality is essential and is not condoned by this court. Nevertheless, we decline to permit a civil suit against the arbitrator for failure to disclose prior business or social contacts because of our policy of encouraging arbitration and of protecting the independence of the decision-made. Permitting civil suit for a lapse in disclosure would chill the willing-ness of arbitrators to serve because of the difficulty of remembering all contacts, however remote, with parties to the arbitration.

"This extension of the grant of immunity does not mean that we are not dismayed by [the arbitrator's] failure to disclose the possibility of a conflict of interest. It should have been a simple matter to note that he had had contacts with the parties involved or, in the event he was not certain, at least state that he might have had impermissible contacts. . . .

"Our decision does not leave aggrieved parties remediless, however. [Minnesota statutes] provide[] that '[u]pon application of a party, the court shall vacate an award where . . . [t]here was evident partiality by an arbitrator appointed as a neutral or corruption in any of the arbitrators or misconduct prejudicing the rights of any party . . . .' We believe the proper remedy lies therein rather than in a civil suit against the arbitrator." (*L & H Airco, Inc. v. Rapistan Corp., supra,* 446 N.W.2d at p. 377.)

In *Blue Cross Blue Shield of Texas v. Juneau* (Tex.Ct.App. 2003) 114 S.W.3d 126, the Texas Court of Appeals rejected the argument that an

arbitrator could be found liable for failing to disclose that he once worked at the same law firm as an attorney representing one of the parties to the arbitration. The court explained: "[The arbitrator's] disclosure requirement was a function of his position as an arbitrator. . . . [The arbitrator] is immune from suit [by Blue Cross] because the disclosure requirement was directly related to his function as an arbitrator. . . . [¶] . . . [¶]

"Even if [the arbitrator] is not protected by the doctrine of arbitral immunity, Blue Cross's appeal still fails . . . . Blue Cross is attempting to circumvent the [state] arbitration act and indirectly attack the [arbitration] award. . . . [¶] . . . [¶]

"The Act's provisions afforded Blue Cross a sufficient mechanism to vacate the arbitration award on the theory that [the arbitrator's] impartiality was compromised. An award under the Act may be vacated if a party establishes 'evident partiality' on the part of an arbitrator. . . . Therefore, Blue Cross had an opportunity to contest [the arbitrator's] impartiality through its motion to vacate. When the motion to vacate proved unsuccessful, Blue Cross [could] not otherwise collaterally attack the award. [¶] . . . [¶]

". . . A suit against an individual arbitrator is not contemplated by the arbitration act. To permit a cause of action against an arbitrator, in addition to the possibility of vacating the award, would contravene the purpose of arbitration. Speed, cost savings, and a final determination would no longer characterize an arbitration proceeding. Instead, a disgruntled party could circumvent the act and seek relief outside the statutory limitations, rendering meaningless the notion that parties can contract to be bound to an arbitrated judgment. In light of the Texas Arbitration Act's purpose, its procedures to vacate an arbitration award, and the strong deference afforded arbitration judgments, we hold that an application to vacate the award for an arbitrator's alleged misrepresentation or failure to disclose a relationship is the exclusive remedy under the arbitration act." (*Blue Cross Blue Shield of Texas v. Juneau, supra,* 114 S.W.3d at pp. 132–136, citations and fns. omitted; accord, *John Street Leasehold, L.L.C. v. Brunjes* (1996) 234 A.D.2d 26 [650 N.Y.S.2d 649, 649–650] (mem. opn.); *Rubenstein v. Otterbourg* (1973) 78 Misc.2d 376 [357 N.Y.S.2d 62].)

In short, California and other jurisdictions recognize that arbitral immunity applies where one of the parties to the arbitration seeks to impose liability based on the alleged bias of the arbitrator or the sponsoring organization.

### 6. *Clear Absence of Jurisdiction*

Stasz also attempts to skirt arbitral immunity on the theory that the arbitration proceedings were automatically stayed pending the outcome of her

appeal in *Stasz I*, in which she unsuccessfully challenged the validity of the arbitration provision. She appears to argue that, because the arbitrator continued to conduct proceedings while the alleged stay was in effect, the arbitration was conducted in the clear absence of jurisdiction, stripping the AAA of immunity. We disagree. (See *Intern. Medical Group, Inc. v. American Arbitration, supra*, 312 F.3d at pp. 842–844; *New England Cleaning v. American Arbitration Ass'n, supra*, 199 F.3d at p. 545; *Larry v. Penn Truck Aids, Inc., supra*, 94 F.R.D. at p. 724.)

As one federal court has stated, the jurisdictional exception to immunity is applicable only if the record before the arbitrator is "so deficient on [its] face as to signal a 'clear absence' of jurisdiction." (*New England Cleaning v. American Arbitration Ass'n, supra*, 199 F.3d at p. 546.) It has also been held that "arbitrators and their sponsors are immune from suit for jurisdictional determinations made in their capacity as arbitrators. . . . [I]t is appropriate to extend to arbitrators the same immunity that . . . courts currently enjoy from suits based on the wrongful exercise of jurisdiction." (*Prudential Bache-Securities v. National Ass'n* (S.D.N.Y. 2003) 289 F.Supp.2d 438, 440, citation omitted.) "[A]rbitral immunity should be extended to cases where the authority of an arbitrator to resolve a dispute is challenged." (*Tamari v. Conrad* (7th Cir. 1977) 552 F.2d 778, 780.) Thus, the "AAA is immune from a suit based on wrongful exercise of jurisdiction." (*Intern. Medical Group, Inc. v. American Arbitration, supra*, 312 F.3d at p. 844.) If an arbitrator or sponsoring organization mistakenly accepts jurisdiction, a party may either seek judicial relief to enjoin the arbitration or object to jurisdiction in the arbitration proceedings and raise the lack of jurisdiction as a ground for vacating the award. (See *Intern. Medical Group, Inc. v. American Arbitration, supra*, 312 F.3d at p. 844; *Tamari v. Conrad, supra*, 552 F.2d at p. 781; *Nat. Ass'n Broadcast Emp. v. Amer. Broadcasting Co.* (2d Cir. 1998) 140 F.3d 459, 462–463; *Michigan Bell Telephone Co. v. Climax Telephone* (W.D.Mich. 2000) 121 F.Supp.2d 1104, 1112–1113.)

As the United States Supreme Court stated long ago with respect to judicial immunity: "[S]ome of the most difficult . . . questions which a judicial officer is called upon to consider and determine relate to his jurisdiction, or that of the court held by him, or the manner in which the jurisdiction shall be exercised. And the same principle of exemption from liability which obtains for errors committed in the ordinary . . . suit where there is jurisdiction of both subject and person, applies in cases of this kind, and for the same reasons." (*Bradley v. Fisher, supra,* 80 U.S. at p. 352.) The high court provided an example of a situation in which jurisdiction would be clearly absent, as follows: "[I]f a probate court, invested only with authority over wills and the settlement of estates of deceased persons, should proceed to try parties for public offences, jurisdiction over the subject of offences being entirely wanting in the court, and this being necessarily known to its

judge, his commission would afford no protection to him in the exercise of the usurped authority." (*Ibid.*; see *Olney v. Sacramento County Bar Assn.*, *supra*, 212 Cal.App.3d at pp. 812–813 [clear absence of jurisdiction is rare].)

Stasz's argument that the arbitrator in this case clearly lacked jurisdiction is based on section 916, subdivision (a) which provides: "[T]he perfecting of an appeal stays proceedings in the trial court upon the judgment or order appealed from or upon the matters embraced therein or affected thereby, including enforcement of the judgment or order . . . ." Stasz argues that section 916 automatically stayed the arbitration while her appeal in *Stasz I* was pending and that the arbitrator unlawfully conducted proceedings during the stay. She presented this "automatic stay" argument to the arbitrator and twice to the trial court in *Stasz II*. Each time, it was rejected.

Assuming, without deciding, that section 916 mandated a delay in the arbitration proceedings, we cannot say that it effected a clear absence of jurisdiction. The statute did not divest the arbitrator of jurisdiction to hear the matter. Rather, it affected the timing of the proceedings. And the arbitrator and the trial court concluded that section 916 stayed *trial court* proceedings, not the arbitration. Simply put, Stasz's remedy for an alleged violation of section 916 was to seek a stay of the arbitration proceedings and, possibly, to petition the trial court to vacate the award on that ground, not to seek to impose liability on the AAA. (See *Intern. Medical Group, Inc. v. American Arbitration*, *supra*, 312 F.3d at pp. 843–844; § 1286.2, subd. (a).)[8]

 In sum, neither the alleged bias of the arbitrator or the AAA, nor a clear absence of jurisdiction deprived the AAA of the arbitral immunity afforded by California common law. Stasz's causes of action against the AAA were properly dismissed.

## C. *Confirmation of the Arbitration Award**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

[8] We do not decide whether a request for a stay should be presented to the trial court or the arbitrator. The parties have not raised that issue. Nor do we address the possible consequences of presenting the stay issue to the arbitrator in the first instance, that is, whether the arbitrator's decision is then binding on the parties absent the limited grounds for setting aside such a decision. (See § 1286.2, subd. (a); *Moncharsh v. Heily & Blase*, *supra*, 3 Cal.4th at pp. 11–33 [with narrow exceptions, arbitrator's decision cannot be reviewed for errors of fact or law]; *Advanced Micro Devices, Inc. v. Intel Corp.* (1994) 9 Cal.4th 362, 372–373 [36 Cal.Rptr.2d 581, 885 P.2d 994] [courts defer to arbitrator's determination of arbitrability of claim]; *First Options of Chicago, Inc. v. Kaplan* (1995) 514 U.S. 938, 943–945 [131 L.Ed.2d 985, 115 S.Ct. 1920] [where parties "clearly and unmistakably" agree that arbitrator should decide question of arbitrability, courts defer to that decision].)

* See footnote, *ante*, page 420.

## III

## DISPOSITION

The judgment in appeal No. B163456 and the orders in appeals Nos. B159163 and B162829 are affirmed.

Spencer, P. J., and Hastings, J., concurred.

Appellant's petition for review by the Supreme Court was denied November 17, 2004. Brown, J., did not participate therein.